### EDDY'S STEAM BAKERY, Inc., v. RASMUSSON, Collector of Internal Revenue.

#### No. 1399.

District Court, D. Montana.

Feb. 5, 1931.

T. B. Weir and Harry P. Bennett, both of Helena, Mont., for plaintiff.

W. D. Rankin, U. S. Atty., of Helena, Mont., and Howard A. Johnson and Arthur P. Acher, Asst. U. S. Attys., both of Helena, Mont., for defendant.

BOURQUIN, District Judge.

Plaintiff sues the collector to recover federal income taxes exacted.

The evidence is that January 1, 1921, O'Connell & Gallivan, a corporation, then and for some time had owned and operated Eddy's Steam Bakery. O'Connell owned all the stock save qualifying shares. Income taxes greater upon corporations than upon individuals, O'Connell and his "attorney," Galusha, in the words of a noted character of the day, "skum a skeme," the bakery to be transferred to and operated by O'Connell. Accordingly, the day last aforesaid a special meeting of the corporate directors accepted O'Connell's proposal to buy all corporate assets, including trade-name and good will, at book value, and a like meeting of all stockholders confirmed the transaction. There were no documents of transfer, no money paid, no note executed, no transfer of stock, though Galusha testifies the stock was pledged to the corporation to secure the debt, but of which O'Connell professes ignorance and is no record.

O'Connell testifies that during 1921 he individually operated the bakery as before he had for the corporation, but billheads were changed by substituting his name for O'Connell & Gallivan beneath the trade-name "Eddy's Steam Bakery," purchases were made in his name, and taxes likewise paid, the corporation transacted no business, was entitled to no profits and received none, and that the chief purpose was to "get away from the higher taxes." For 1921 the corporation made return it was inactive, without income or expense, and O'Connell in his return included the operations of the bakery. The result was to diminish taxes some $2,000.

The Revenue Act of 1921 (42 Stat. 227) diminished the spread between corporation and individual taxes, and January 2, 1922, the corporate directors accepted another proposal from O'Connell that it repurchase the assets aforesaid at book value. Again were no documents, no money paid, and O'Connell "presumes the stock was in the same condition as in 1921"; but Galusha testifies the debt was canceled and the stock returned, though again no record thereof. Thereafter the corporation operated the bakery, and in 1923 substituted the latter's name for its own. In 1926 the Commissioner assessed against the corporation some $3,000 income taxes for 1921, which the corporation paid, and this action followed.

Taxes, revenues, are the life blood of states, without which they perish. Reasonable, equal, and for legitimate objects of government, they are an obligation comparatively light and in the main more or less cheerfully paid.

Unhappily, however, Legislatures, controlling revenues and public funds, are the persistently hunted prey of greedy and unscrupulous blocs who clamor (1) for questionable appropriations of public money for a great variety of quasi doles and state socialistic schemes pauperizing the spirit, and (2) for relief from taxes by shift of the burden to others. "Where the carcass is are the vultures gathered together," and there too does the "tax expert," magician, witch doctor, or hexer find good hunting in a fertile field.

Too often legislators over amiable or sensitive to the source and precariousness of official tenure, and spending other people's money or taxing other's property, ignore the pole star of Constitutions that all taxation shall be reasonable, equal, and for public purposes, and fall easy victims to these tireless lobbies. The inevitable result is irregular and wasteful appropriations, unreasonable and unequal taxation, intolerable burdens threatening the very existence of private property and government, taxes too often sullenly paid only when they cannot be evaded. Hence, though evasion of taxes is a fraud upon society, the prevalent moral code little frowns upon it and attaches slight if any turpitude thereto. It is of course true that an owner lawfully may and many do abandon or sell property to escape taxes. To be lawful, however, the sale must be real and not sham, permanent and not temporary, in good faith to transfer the property and not merely to pass title to evade taxes, that accomplished, title to be restored. Substance and not form, intent and not declarations, give color to and determine the character of the transaction when in issue. The law looks quite through all camouflage to discover what lies behind. See Shotwell v. Moore, 129 U. S. 596, 9 S. Ct. 362, 32 L. Ed. 827; 37 Cyc. 770 and cases.

With these principles in mind, it is obvious that the transaction between the corporation and O'Connell was fictitious in so far as transfer of the former's assets to the latter is concerned, and, had it been to defeat taxes upon the property itself, would have been illegal and ineffective. But that is not this case; not taxes upon property but taxes upon persons based on income alone are involved.

If the corporation had no income, the law imposed no taxes, however much property it owned, and that whether lack of income was due to poor management, poor business, poor patronage, or no collections, or inaction or suspension of business; moreover, no taxes,

even though the corporation improvidently gave to another the right to operate its instrumentalities, conduct the business, and take and enjoy the profits.

That is the instant case. Fictitious though the transaction was, it would prevail against all save corporate creditors. To avoid corporate taxes, the intent of the scheme was to directly vest in O'Connell the income which otherwise would directly vest in the corporation and indirectly in O'Connell as sole stockholder, if any dividends.

The corporation, relieved of all labor and responsibility to perpetuate the business, trade-name, and good will, was likewise of income. O'Connell assumed the first to secure the last.

Although the intent of the transaction was a sham transfer of title to the property, it was also to really vest O'Connell with all income accruing from his use of the property, thereafter both intents equally executed. The case is as simple as that of John Jones who that year permitted his son Sam to farm his father's land and take the profits. However large the latter, clearly no taxes were due from John. With that case, this is all fours, even though confused by a disingenuous scheme.

The corporation thus having no income in 1921, the taxes assessed were illegal, and plaintiff is entitled to recover as it prays. Judgment accordingly.